IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CARRICK TRUCKING, INC.
d/b/a OUTLANDER GRAVEL                                         PLAINTIFF

            v.          Civil No. 09-2053

RODNEY T. NIETERT; SAMARITAN
HOLDINGS, INC.; OUTLANDER TREE
SERVICES, INC.; JERRY DON HATTABAUGH;
and JAMES STEVEN BLACK d/b/a JSB
GRAVEL                                                        DEFENDANTS

<u>MEMORANDUM OPINION</u>

On the 2nd day of April, 2010, the captioned matter came on for hearing. All parties appeared in person or by their authorized representatives, and all parties were represented by counsel. The matter had previously been scheduled for trial by jury, but all parties waived this right, and agreed to trial of the matter to the Court. Testimony was heard and exhibits received on April 2 and April 5, 2010, and the Court now makes the following findings of fact and conclusions of law.

<u>FINDINGS OF FACT</u>

1.   This case arose out of the operation of a gravel pit (the "Pit") located near Waldron, Arkansas. In 2008, when the events in suit began, the Pit was owned by defendant Jerry Don Hattabaugh ("Hattabaugh"), subject to a mortgage held by Community National Bank in Waldron.

2.   Hattabaugh entered into a Contract of Sale (the "Hattabaugh/Outlander Contract"), selling the Pit to defendant, Outlander Tree Services, Inc. ("Outlander"), a corporation formed

by defendants Rodney Taylor Nietert ("Nietert") and Tim Johnson ("Johnson").

The Hattabaugh/Outlander Contract -- signed on June 4, 2008 -- provided that Hattabaugh would execute a Warranty Deed to the Pit, and Outlander would execute a Quitclaim Deed to the Pit, both to be held in escrow[1] until either

* Outlander paid in full, whereupon the escrow agent would deliver the Warranty Deed to Outlander, or

* Outlander defaulted, whereupon the escrow agent would deliver the Quitclaim Deed to Hattabaugh.

3. Outlander commenced operations at the Pit, but quickly ran into difficulties. It was not able to conduct operations efficiently enough to keep up with the demand for its main product, a type of gravel known as SB2.

4. Nietert learned of the existence of a Michigan company, plaintiff Carrick Trucking, Inc. ("Carrick Trucking"), which had experience in running a crushing operation, and contacted them for help.

Nietert, acting ostensibly as Outlander, agreed with Carrick Trucking that the latter would move its equipment into the Pit and conduct crushing operations for Outlander.

On July 27, 2008, the two companies entered into a written contract (the "Crushing Contract") which provided as follows:

---

[1]Incomprehensibly, Brian Mueller, who drafted the Contract of Sale, provided that Hattabaugh, the seller, would be the escrow agent.

* that Outlander would be responsible for blasting rock to be crushed into gravel, and for sales of gravel;

* that Carrick Trucking would provide all necessary equipment to crush the gravel and be responsible for all costs incurred in processing it;

* that Outlander would pay Carrick Trucking 70% of the gross income received by Outlander for sale of the gravel;

* that processed material would be carried in Carrick Trucking's inventory until paid for by Outlander;

* that Carrick Trucking would have the crushing work for all materials at the Pit for the life of the Pit; and

* that if Outlander sold the Pit, Carrick Trucking would have the first option of crushing for the new buyers or would be "compensated" by Outlander.[2]

5. Carrick Trucking brought equipment from Michigan to Arkansas, at a cost of about $40,000.00, and commenced crushing operations on August 2, 2008.

As gravel was crushed, it passed over a belt scale which weighed the product, allowing Carrick Trucking to maintain accurate records of the tonnage it had processed.

6. In mid-November, 2008, Gail and Dean Carrick, principals of Carrick Trucking, arrived unannounced at the Pit, being concerned about delinquent accounts. Their review of the books

---

[2]Nietert explained that he understood this to mean that Carrick Trucking could negotiate with any new owner of the Pit or that he would "compensate them for going back home."

showed that some $10,000.00 in cash receipts had been marked "paid" but had not been accounted for to Carrick Trucking.

Gail Carrick called Johnson, who initially avoided her call and then was evasive on the phone. The clerical employee hired by Carrick Trucking failed to give satisfactory answers to Gail Carrick's questions and abruptly quit. Johnson disappeared too, along with some of Outlander's equipment used at the Pit.

Nietert finally paid Carrick Trucking the missing money, and agreed to allow Carrick Trucking to handle the receivables from that point forward. There was no evidence that the 70/30 split of gross profits was altered as a result of this change.

7. The incident of the missing money was the end point for any involvement by Johnson in the business of the Pit, and also caused Nietert to abandon Outlander as a vehicle for his business dealings.

Nietert then incorporated defendant, Samaritan Holdings, Inc. ("Samaritan"), to take the place of Outlander.

Nietert testified that he did not have a corporate minute book for Outlander; that he did not know what offices he held in that corporation; that Outlander never held meetings, issued stock, or passed resolutions; and that it existed in name only.

Nietert also testified that Outlander's corporate charter had been revoked, and that Samaritan was not in good standing with the State of Arkansas.

The foregoing facts support the Court's conclusion of law -- hereinafter expressed -- that both corporations were essentially

sham corporations serving as alter egos to Nietert, rather than bona fide business organizations.

8.   At the end of January, 2009, the Carricks returned to Michigan due to a death in the family.  They came back to Arkansas in mid-March, at which time it was necessary to conduct a blast to produce rock to be crushed.

When Nietert informed the Carricks that he could not afford to pay for the blast, as he was in financial difficulties, Carrick Trucking agreed to work with him in funding the blast, fronting the money needed to the extent the cost was not covered by funds then payable to Nietert.

9.   On April 14, 2009 -- before the blast was conducted -- Nietert, Hattabaugh, and Gail Carrick went to Community National Bank to try to work out a plan to address Nietert's financial situation and its impact on the Hattabaugh mortgage.

Nietert was broke and had failed to make his March payment on the Pit.

Carrick Trucking was interested in buying the Pit, but no firm agreement had been reached, and the Carricks wanted to know what was owed against the property.

At this April 14, 2009, meeting, Hattabaugh agreed to extend the overdue payment in reliance on Nietert's statement that he had some money coming. A handwritten agreement was signed by Nietert and Hattabaugh, stating as follows:

> Due to the potential sale of the land and business I, Jerry Don Hattabaugh, agree to extend one payment payable

by Outlander Tree Service Inc. concerning the contract of sale.  Next payment due date is April 16th, 2009.

10.   Relying on Nietert's payment extension thus acquired, the Carricks went ahead with the blast, using $9,300.00 that Carrick Trucking owed to Nietert and paying the remainder of the cost.  On April 23, 2009, Carrick Trucking paid Harrison Construction Company, Inc. ("Harrison") $17,996.72 to conduct the blast.

11.   From the April 23 blast, Carrick Trucking processed an inventory of products including SB2 red, SB2, crushed shale, septic rock, crusher dust, oversize rock, rip rap, and fill dirt.  The value of this inventory (with an SB2 discount based on testimony of Scott County Judge James Forbes that due to quality problems it was worth only $5.50/ton) was $165,550.00.

12.   The proposed sale of the Pit to Carrick Trucking did not occur, and on April 28, 2009, Nietert contacted defendant James Steven Black ("Black"), an acquaintance who worked insulating chicken houses but was looking to get into a different line of work.

13.   Black had no experience in the gravel business, but Nietert told him the Pit was "a good deal," and he agreed to buy it that same day.

Nietert arranged for himself, Black, and Hattabaugh to meet at the office of attorney, Brian Mueller ("Mueller"), to effect the transaction, and asked Mueller to prepare the necessary documents.

Mueller prepared a Contract of Sale (the "Hattabaugh/Black

Contract"), which was similar to the Hattabaugh/Outlander Contract in most respects. However, instead of providing that "[s]cales and outbuilding are included in this transaction and become the personal property of Purchaser," the Hattabaugh/Black Contract provided that "[s]cales, outbuilding <u>and all materials on the ground including crushed gravel</u> are included in this transaction and become the personal property of the Purchaser." (Emphasis added.)

14. Neither Black nor Hattabaugh could read well enough to understand the Hattabaugh/Black Contract. Both men relied on information given to them about the document by Nietert.

Moreover, Hattabaugh wanted to show the contract to his attorney before he signed it. His attorney was not available that day and he could not do so, and Hattabaugh agreed to go forward and sign the contract without any input from his attorney when he was offered an additional $10,000.00 to close the deal immediately.

Hattabaugh knew that Carrick Trucking's gravel inventory was included in the contract and understood that he did not own the gravel inventory -- but he nevertheless signed the document.

15. Black was under the impression that Mueller represented both him and Nietert in the transaction -- obviously not understanding that this would be a conflict of interest if it were the fact.

Although Nietert admitted arranging the meeting and telling Mueller to prepare the documents, he denied that Mueller was his

attorney for this transaction and denied telling Mueller what to put in the documents.

The Court does not find Nietert's testimony credible on this point and finds that Mueller was Nietert's attorney; that Nietert told him what provisions to include in the contract; and, specifically, that Nietert directed Mueller to add the language transferring the Carrick Trucking gravel inventory to Black.

16.  Nietert also told Black that Carrick Trucking was not producing quality products and that Black should get someone else to do his crushing work.

This statement naturally tended to defeat the provision in the Crushing Contract pursuant to which Carrick Trucking would have the first option of crushing for any new buyer of the Pit.

17.  In addition to the Hattabaugh/Black Contract, Mueller:

*    prepared a Warranty Deed for Hattabaugh to sign (to convey the Pit from Hattabaugh to Black);

*    prepared a Quitclaim deed for Black to sign (to re-convey back to Hattabaugh any interest Black might have acquired in the Pit); and

*    provided in the contract that Hattabaugh would hold these documents in escrow.

Finally, Mueller prepared a typewritten document (the "Eviction Notice") which stated as follows:

To Whom It May Concern:

Please be advised that pursuant to the default of OUTLANDER TREE SERVICES, INC., JERRY DON HATTABAUGH, has retaken possession of the real estate described in the attached exhibit and has entered into a Contract of Sale with JAMES STEVEN BLACK, d/b/a JSB GRAVEL on April 28, 2009. I, JAMES STEVEN BLACK, hereby request that you vacate my property immediately. Equipment/personal effects should be scheduled to be gone no later than Sunday, May 3, 2009.

If you have any questions, do not hesitate to contact me. Please govern yourself accordingly.

This Eviction Notice was signed by Black, but no contact information for Black was given.[3]

Nietert was the motivating factor behind the Eviction Notice, as he testified that he had Carrick Trucking served "as my employees" and that he thought it was his responsibility to "get them out." This action on the part of Nietert not only tended to defeat the provision in the Crushing Contract pursuant to which Carrick Trucking would have the first option of crushing for the new buyers, it created a situation where it was impossible for Carrick Trucking to realize any profit from the inventory of gravel it had created.

18. About 4:00 p.m. on April 28, 2009, Nietert showed up at the Pit and informed the Carricks that he had sold the Pit and that they would have to leave.

---

[3]Handwritten under Black's signature was the notation "Attorney: Brian Mueller 479-675-4788." Gail Carrick testified that this was not on the Eviction Notice when she received it, and the Court finds this testimony credible, believing that if attorney Mueller had intended this information to be in a document he prepared, it would have been typewritten therein.

Nietert was followed by a Deputy Sheriff who handed Gail Carrick the Eviction Notice. The Deputy Sheriff escorted the Carricks to the main highway and shut the gate behind them.

19. Carrick Trucking did not remove its equipment or inventory from the Pit.

Not only was the Pit gated during the time stated in the Eviction Notice for removal, but Gail Carrick testified that it would have taken about a month to obtain the regulatory permits necessary to transport the crushing equipment on public roads.

The equipment was eventually relocated out of the area of active blasting and crushing operations, and the inventory was sold by Black.

In mid-June, 2009, Hattabaugh asked the Carricks not to be "in a big hurry" to move their equipment, till he could see how the new owner worked out.[4]

20. After Carrick Trucking ceased operations at the Pit, Nietert collected some $5,692.00 in accounts payable, and failed to pay Carrick Trucking its 70% of these monies. He also failed to pay Carrick Trucking that part of the cost of the April 23 blast not covered by money owed to him by Carrick Trucking, $8,696.72.

21. Black sold the gravel inventory crushed by Carrick Trucking, and did not pay Carrick Trucking any portion of his receipts -- although he acknowledged that the inventory belonged to

---

[4]The "new owner," Black, did not work out, and at the time of trial Carrick Trucking was conducting crushing operations for yet another new owner, Terrell Pankey.

Carrick Trucking by telling the company that it could come and move the gravel.

22.   Black attempted to blast on two occasions:

*   the first time, Harrison refused to conduct the blast because Black would not indemnify it for any damage that might occur to Carrick Trucking's equipment;

*   the second attempt to blast was aborted when Hattabaugh filed suit in the Circuit Court of Scott County, Arkansas, to enjoin Black from blasting the floor of the Pit, based on alleged concerns that it would create a water retention problem.

Black lost $1,700.00 he had paid to Harrison for the second attempted blast, and $12,000.00 for rent on a rock crusher he was unable to use for two weeks during the life of the injunction obtained by Hattabaugh.

Black attributed these losses to Carrick Trucking -- claiming that Carrick Trucking had failed to move its equipment and had paid for the lawsuit instituted by Hattabaugh.

Black also claims that Carrick Trucking should pay him $500/month in storage fees for its equipment left at the Pit.

The facts do not support the foregoing claims by Black. Carrick Trucking was locked out of the Pit and unable to move its equipment, and Hattabaugh -- not Carrick Trucking -- paid for the lawsuit.  While Hattabaugh may have paid with monies obtained from Carrick Trucking for the sale of a truck, and Carrick Trucking may have been relieved to see the blast put off or prevented, these

factors do not make Carrick Trucking the instigator of the litigation.

23.  Black stopped running the Pit in late August or early September, 2009.  At the time of trial, a new owner, Terrell Pankey ("Pankey") was operating the Pit, and Carrick Trucking was doing Pankey's crushing work.

<u>CONCLUSIONS OF LAW</u>

24.  Carrick Trucking filed suit on May 5, 2009, against Nietert, Outlander, Samaritan, Hattabaugh, and Black, making the following claims:

*   as against Outlander and Samaritan, Carrick Trucking asserts a claim for breach of contract; and

*   as against Nietert, Hattabaugh, and Black it asserts claims for conversion and unjust enrichment.

Nietert, Outlander, and Samaritan counterclaimed against Carrick Trucking for breach of contract, fraud, conversion, unjust enrichment, and intentional interference with business expectancy.

Black counterclaimed against Carrick Trucking for failing to remove its equipment from the property, casting this claim as one for intentional interference with business expectancy.

Black also appears to seek a declaratory judgment that he owns all the blasted rock and crushed gravel that was on the ground when he bought the gravel pit.

25.  <u>Carrick Trucking's Breach of Contract Claim</u>:

In order to prove a claim for breach of contract, the claiming party must show that there was a contract; that the contract required the defending party to perform or not perform a certain act; that the claiming party did what was required of it under the contract; and that the defending party did not do what was required of it under the contract.  **AMI 2401**.

When the Court analyzes the breach of contract claim of Carrick Trucking, it reaches the following conclusions:

(a)  Was there a contract?

There is no dispute that Carrick Trucking had a contract with Outlander -- the Crushing Contract.  Because Outlander was nothing more than a sham corporation serving as an alter ego for Nietert, the Court concludes that the Crushing Contract bound Nietert as well as Outlander.  Any rights or responsibilities assigned to Outlander under the Crushing Contract are also, therefore, rights and responsibilities of Nietert.

Likewise, Samaritan was a sham corporation and alter ego of Nietert, and he is bound to the extent it is bound.

(b) Did the Crushing Contract require Outlander to perform or not perform certain acts?

The Crushing Contract required Outlander to blast rock; to sell gravel; and to pay Carrick Trucking 70% of the gross it received from such sales.  It also required Outlander to allow Carrick Trucking to crush gravel for the life of the Pit, and to

give Carrick Trucking first option to crush for any buyer of the Pit.

(c)  Did Carrick Trucking do what was required of it under the Crushing Contract?

Carrick Trucking was required to provide all necessary equipment to crush gravel and be responsible for all costs incurred in processing it.

There is no evidence that Carrick Trucking failed to carry out these duties, and in fact the evidence showed that Carrick Trucking assisted Outlander in fulfilling its duties under the Crushing Contract, such as marketing and blasting, so as to keep the crushing operation going.

(d)  Did Outlander do what was required of it under the Crushing Contract?

Outlander failed to do what was required of it under the Crushing Contract in the following respects:

*   it failed to pay Carrick Trucking 70% of gross sales for crushed gravel, as evidenced by the missing money incident in November, 2008, and the unremitted collection of receivables after Carrick Trucking was evicted;

*   it failed to fund a necessary blast in April, 2009;

*   it (Neitert) criticized Carrick Trucking to Black in such a manner as to insure that Black would not retain Carrick Trucking to do crushing at the Pit; and

*   it evicted Carrick Trucking from the Pit in April, 2009.

The first two of these breaches are not, in the Court's view, actionable.  A breach of contract may be waived or excused by continued performance under the contract. **AMI 2437.**  Carrick Trucking continued to operate under the Crushing Contract after the incident of the missing money was resolved, excusing that breach. Carrick Trucking also agreed to front the money for the April, 2009, blast, thereby continuing to accept benefits under the contract, which constitutes a waiver of Nietert's anticipatory breach. **Stephens v. West Pontiac-GMC, Inc.**, **7 Ark. App. 275, 278, 647 S.W.2d 492 (Ark. App. 1983).**

The third and fourth incidents constitute material breaches of the Crushing Contract by Outlander.  "A 'material breach' is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party," and it excuses performance and allows suit for damages by the other party. **AMI 2327.**  By criticizing Carrick Trucking to Black, and evicting the Carricks from the Pit, Nietert defeated substantial purposes of the Crushing Contract for Carrick Trucking, insuring that it would not benefit from the provisions that it could crush for the life of the Pit or have first option to crush for any new owner.

26. <u>Damages for Carrick Trucking's Claim of Breach of Contract</u>:

In determining the appropriate amount of damages for breach of contract, the general rule is that the amount should reasonably

and fairly compensate the prevailing party for damages sustained by the breach, but not put it in any better position than it would have been in without the breach. **AMI 2442.** Applying this rule to the breach of contract claim of Carrick Trucking, the Court finds the following damages were sustained:

    * Carrick Trucking was entitled to 70% of the gross sales receipts from the inventory of crushed gravel it created at the Pit. This inventory had a value of $165,550.00, and 70% of that is $115,885.00.

    * Carrick Trucking was also entitled to 70% of receivables collected by Outlander in the amount of $5,692.00, or $3,984.40. These sums total $119,869.40, and the Court concludes that Carrick Trucking is entitled to judgment against Nietert, Outlander, and Samaritan -- jointly and severally -- for this amount on its breach of contract claim.

The Crushing Contract also provided that Carrick Trucking would be entitled to be compensated if it did not get the first option to crush gravel for Black, and there was evidence that the parties intended this provision in the Crushing Contract to relate to repayment of the cost of moving the crushing equipment back to Carrick Trucking's home base in Michigan.

While this provision was clearly breached, the evidence showed that Carrick Trucking never moved its equipment back to Michigan, and was at the time of trial crushing gravel at the Pit for Pankey. Under these circumstances, the Court finds no basis to award breach

of contract damages to compensate Carrick Trucking for failing to get the first option.

27. <u>Breach of Contract Claims by Nietert, Outlander and Samaritan</u>:

Nietert, Outlander, and Samaritan assert claims for breach of contract against Carrick Trucking, but the Court finds no evidence whatsoever to sustain those claims, and they will be denied and dismissed with prejudice.

28. <u>Carrick Trucking's Claims of Conversion</u>:

Carrick Trucking asserts claims of conversion against Nietert, Hattabaugh, and Black. Conversion is established upon proof that the claiming party owned or was entitled to possess property, and that the defending party intentionally took or exercised dominion over that property in violation of the claiming party's rights. **AMI 425.**

The evidence establishes that Carrick Trucking owned or was entitled to possess the inventory of gravel it processed at the Pit:

* The Crushing Contract provides as much, *vis a vis* Outlander, by its provision that processed material would be carried in Carrick Trucking's inventory until paid for by Outlander.

* Hattabaugh admitted that the gravel inventory belonged to Carrick Trucking.

\*    Black offered to allow Carrick Trucking to haul the gravel off the property, in effect admitting that the gravel belonged to Carrick Trucking and not to him.

This evidence is consistent with Arkansas law that "where minerals are extracted under a lease, the title to the minerals vests absolutely as personal property in the lessee as soon as they are mined and removed from their original location." **Pemberton v. Arkansas State Highway Commission**, 268 Ark. 929, 9323, 597 S.W.2d 605, 608 (Ark. App. 1980).

The conveyance in suit is a contract for sale rather than a lease, but the admissions of Hattabaugh and Black make **Pemberton** analogous. Outlander had the right to mine (blast) minerals from the Pit as long as it was rightfully in possession (i.e., held the Pit under the Hattabaugh/Outlander Contract), and those minerals became the personal property of Outlander upon mining. Under the Crushing Contract, the gravel products crushed from the mined minerals (stone) were the inventory of Carrick Trucking until sold, at which time Carrick Trucking was entitled to 70% of the gross proceeds.

When Nietert arranged the transaction by which he returned the Pit to Hattabaugh and Hattabaugh sold it to Black, Nietert wrongfully caused the purported sale of the gravel inventory that belonged to Carrick Trucking, and Hattabaugh knowingly acquiesced in that sale. Thus, both Nietert and Hattabaugh are liable to Carrick Trucking for conversion.

The Court finds Black also liable for conversion.  Black could only acquire what Hattabaugh had a right to sell, and thus he did not acquire the inventory which he later sold.  Although Black was not aware of all relevant facts about the sale of the Pit, he was not a bona fide purchaser because he was on notice of facts that would have caused a reasonable purchaser to make further inquiry, and which would have led him to discover that Carrick Trucking owned the gravel inventory.  "Whatever is notice enough to excite attention, put a party on guard and call for inquiry is notice of everything to which the inquiry might lead, and whenever one has sufficient information to lead him to a fact he shall be deemed conversant with it."  **Woods v. Wright**, **254 Ark. 297, 302, 493 S.W.2d 129, 131 (Ark. 1973).**

Here, the haste with which the transaction was put together is a fact which should have led to further inquiry.  Black agreed to buy property valued at almost half a million dollars without even making a site visit -- which would have shown the equipment of the Carricks *in situ* and would have shown that it was not such as could be removed on short notice.  Black also agreed to the deal without being able to read and understand the documents he was signing.  Hattabaugh obviously wanted to consult his attorney about the transaction, but was persuaded to go forward immediately rather than wait till he could see the attorney when offered an additional $10,000.00.  These aspects of the transaction, known to Black, would have put a person of ordinary prudence on notice that

something was not right about the deal.  A simple inquiry posed to the Carricks would undoubtedly have revealed their claim to the gravel inventory.

Since Nietert, Hattabaugh and Black each sold the gravel inventory, each exercised dominion over the gravel inventory in violation of the rights of Carrick Trucking, for which Carrick Trucking is entitled to judgment.  The damages for this conversion amount to 70% of the discounted value of the inventory ($165,550.00), or $115,885.00, which should be awarded jointly and severally, given that it was the interrelated actions of Nietert, Hattabaugh, and Black that jointly deprived Carrick Trucking of its rights to the gravel inventory. These damages are duplicative of the damages sustained by Carrick Trucking for breach of contract on the part of Nietert and Outlander, for which Carrick Trucking can have but one recovery.

29.  <u>Claims of Conversion Against Carrick Trucking</u>:

Nietert, Hattabaugh, and Black alleged conversion on the part of Carrick Trucking, but no evidence supports these claims and they will be denied and dismissed with prejudice.

30.  <u>Carrick Trucking's Claims of Unjust Enrichment</u>:

Carrick Trucking also asserts claims of unjust enrichment against Nietert, Hattabaugh, and Black.  An action based on unjust enrichment "is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain [it]."  **<u>DePriest v.</u>**

**AstraZeneca Pharmaceuticals, L.P.**, 2009 Ark. 547, --- S.W.3d ---, 2009 WL 3681868 (2009).

The same facts and circumstances that prove a claim of conversion against Nietert, Hattabaugh, and Black, prove a claim of unjust enrichment on behalf of Carrick Trucking against these defendants, and the damages are the same for both claims. Thus, Carrick Trucking is entitled to judgment, jointly and severally, against Nietert, Hattabaugh, and Black, on its claim of unjust enrichment. Damages will be awarded in the sum of $115,885.00.

These damages are duplicative of the damages sustained by Carrick Trucking for breach of contract on the part of Nietert and Outlander, and for conversion on the part of Nietert, Hattabaugh, and Black, and Carrick Trucking can recover them only once.

In addition, the Court finds that Nietert, Outlander, and Samaritan were unjustly enriched at the expense of Carrick Trucking when Carrick Trucking advanced the sum of $8,696.72 for the April, 2008, blast that was the financial responsibility of Nietert, Outlander, and Samaritan. Carrick Trucking will be given judgment for that sum against Nietert, Outlander, and Samaritan.

31.  Unjust Enrichment Claims against Carrick Trucking:

The Court finds no evidence of any unjust enrichment of Carrick Trucking at the expense of Nietert, Hattabaugh, or Black, and their claims on that theory will be denied and dismissed with prejudice.

32.   <u>Claims for Interference With Business Expectancies</u>:

Nietert, Outlander, Samaritan, and Black all claim that Carrick Trucking interfered with their business expectancies. This claim requires proof of a valid business expectation; knowledge on the part of Carrick Trucking of that business expectation; action that intentionally and improperly induced or caused a disruption or termination of that business expectation; and damages proximately caused by such disruption or termination. **AMI 403.**

Nietert, Outlander, and Samaritan offered no evidence whatsoever that would tend to establish their claims of interference with business expectation, and those claims will be denied and dismissed with prejudice.

Black's claim for interference was premised on evidence that he could not conduct blasting operations at the Pit for several weeks because Carrick Trucking's equipment was located too close to the blast site.

Black failed, however, to show that any conduct of Carrick Trucking that prevented him from blasting was intentional or improper. Indeed, it appears to the Court that Nietert and Black caused the problems which resulted in the failure to remove the equipment, by summarily evicting Carrick Trucking; not giving information about how they could be reached; and allowing too short a time frame for such a complicated move. Black's claim for interference with business expectancy will likewise be denied and dismissed with prejudice.

33.   <u>Fraud Claims against Carrick Trucking</u>:

Nietert, Outlander, and Samaritan claim that Carrick Trucking is liable to them on a theory of fraud.  This claim requires proof that Carrick Trucking made a false representation of material fact; that Carrick Trucking either knew or believed that the representation was false or knew or believed that it did not have sufficient information to make the representation; that Carrick Trucking intended Nietert, Outlander, or Samaritan to act on the representation; that Nietert, Outlander, or Samaritan justifiably relied on the representation; and that Nietert, Outlander, or Samaritan sustained damages as a result.  **AMI 402.**

Nietert, Outlander, and Samaritan did not present any evidence of fraud, nor have they offered any analysis in post-trial briefings as to how they think this tort might have been committed or how they might have been damaged by it.  The fraud claims of Nietert, Outlander, and Samaritan will, therefore, be denied and dismissed with prejudice.

34.   <u>Black's Claims re Gravel Inventory</u>:

Black makes a claim against Carrick Trucking for failing to remove its equipment from the Pit, and appears to seek a declaratory judgment that he owned the gravel inventory created by Carrick Trucking.  For reasons already explained in this Opinion, these claims will be denied and dismissed with prejudice.

35.  <u>Carrick Trucking's Post-Trial Motion</u>:

By post-trial motion, Carrick Trucking seeks to amend its pleadings to add claims of civil conspiracy and breach of contract as against Nietert, and to add claims for civil conspiracy and tortious interference with contract as against Black and Hattabaugh.

The reasons for these additional claims, and the analysis of how they relate to the evidence are not clear, and the Court finds that the motion should be denied.

36.  <u>Unresolved Evidentiary Issue</u>:

The parties also submitted an evidentiary issue to the Court for post-trial decision.  The issue is the admissibility of a series of e-mail communications between attorneys attempting to negotiate the sale of the Pit between Black and Carrick Trucking.

The Court finds that these communications are not admissible, as they are evidence of a series of negotiations which, if they had been successful, would have concluded this case.  See **F.R.E. 408**.

37.  Black also indicates in his post-trial briefing that his arguments are applicable to his **F.R.C.P. 50** motion at the close of the evidence.  That motion is without merit, and is denied.

38.  By separate document, judgment will be forthwith entered in accordance with this Memorandum Opinion.

**IT IS SO ORDERED**, this 30th day of April, 2010.

/s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**
